**Patrick HIGGINS, Plaintiff,**

v.

**CORRECTIONAL MEDICAL SERVICES OF ILLINOIS, INC., et al., Defendants.**

No. 95 C 4203.

United States District Court,
N.D. Illinois,
Eastern Division.

July 1, 1998.

Richard T. Flynn, Flynn, Murphy, Ryan & Seyring, Chicago, IL, for Plaintiff.

Robert P. Vogt, Weldon, Linne & Vogt, Chicago, IL, for Defendants.

## MEMORANDUM OPINION AND ORDER

KEYS, Magistrate J.

This matter comes before the Court on Defendant's Motion for Summary Judgment, pursuant to Federal Rule of Civil Procedure 56. For the following reasons, Defendant's motion is granted.

### BACKGROUND

#### A. Facts

On June 14, 1994, Plaintiff Patrick Higgins was brought to the Kane County Correctional Center ("Kane County") after being arrested the previous day. (Plaintiff's Local Rule 12(N)(3)(a) Response to Defendant's Rule 12(M) Statement of Uncontested Facts [1] [12(N)(3)(a)] ¶ 1.) After a preliminary hearing on June 16, 1994, Mr. Higgins was handcuffed for transport back to Kane County. (Id.; Higgins Dep. 37–38.) The guards moved Mr. Higgins' arms in a wide circular motion from over his head to behind his lower back, where his wrists were secured with the handcuffs. (12(N)(3)(a) ¶ 2.) Mr. Higgins contends that he suffered some sort of injury to his left shoulder at this point.[2] (Id.)

---

1. While the purpose of this Statement is to rebut the movant's uncontested facts, Plaintiff has also provided the Court with a virtual fountainhead of further uncontested facts (though most are immaterial). They are helpful, however, in setting the stage for the litigation.

2. Mr. Higgins has told multiple physicians that his shoulder was actually dislocated due to the handcuffing incident on June 16, 1994. (Defendants' Rule 12(M) Statement of Uncontested Material Facts [12(M)] ¶ 2.) However, Mr. Higgins admits that he was not sure if his shoulder had "come completely out" or if he had just pulled a muscle; however, he was sure that it "did not feel right." (12(N)(3)(a) ¶ 2.)

On June 19, 1994, Mr. Higgins awoke around 6:00 a.m. and realized that his shoulder had "popped out." (12(M) ¶¶ 3, 4.) Mr. Higgins moved from his cell to the day room and attempted, personally and with the assistance of other prisoners, to contact a guard to take him to the infirmary. (12(N)(3)(a) ¶ 7.) Because the guards would only periodically check the day room, and then only by quickly walking through a bulletproof plexiglass tunnel, it was difficult for Mr. Higgins to alert a guard of his condition. (Id.) More than eight hours after he awoke, Mr. Higgins gained the attention of one of the guards, and was escorted to the infirmary around 2:40 p.m. (Id.; 12(M) ¶ 7.)

At the infirmary, Mr. Higgins saw Defendant Nurse Julia Brown. (12(M) ¶ 8.) He informed Nurse Brown that he "had dislocated [his] shoulder and [his] shoulder popped out of place or something like that, and [he] needed to go to the emergency room and have it reset." (12(M) ¶ 11; Higgins Dep. 55.) Nurse Brown took his statement and asked Mr. Higgins to open his shirt so she could visually examine his shoulder. (12(M) ¶ 11; 12(N)(3)(a) ¶ 11.) Mr. Higgins cooperated and Nurse Brown visually inspected his shoulder. (12(N)(3)(a) ¶ 11.) Nurse Brown did not record her visual observations. She then attempted to palpate the shoulder, but Mr. Higgins adamantly refused, stating that he "didn't care if the doctor or the president came, they weren't going to be poking that shoulder the way it felt." (12(M) ¶ 11.) Nurse Brown informed Mr. Higgins that, in any case, they had twenty-four hours to reset breaks and dislocations, placed him on the doctor's call list for the next day, and offered him some Tylenol for the pain. (12(M) ¶ 12; 12(N)(3)(a) ¶ 12; 12(N)(3)(b) ¶ 9.) Mr. Higgins declined the Tylenol and walked back to his cell on his own accord. (12(M) ¶ 12 .)

Mr. Higgins returned to the infirmary shortly thereafter, around 4:00 p.m. that same day, and saw Defendant Nurse Karen Botello. (12(M) ¶ 17.) Following department procedure, Nurse Botello took down his history, and noted that his left shoulder was "forward and lower than right." (12(N)(3)(a) ¶ 17.) She testified that Mr. Higgins could walk and talk normally, his appearance (with the exception of the left shoulder) was normal, and he exhibited no signs of extreme or severe pain. (12(M) ¶ 17.) He merely stood there, favoring one shoulder (Id.), insisting that she call her "boss" so he could tell him that he needed to go to the hospital. (Higgins Dep. 71–72.) Nurse Botello offered Mr. Higgins some Tylenol, which he refused because it was "like throwing a cup of water on a fire." (12(N)(3)(a) ¶ 17.) It appears that Mr. Higgins left at this point.

Because of Mr. Higgins' insistence, Nurse Botello called her supervisor sometime around 5:00 p.m. (12(M) ¶ 17; Higgins Dep. 71.) The content of that conversation is unknown. Around the same time, Mr. Higgins returned to the infirmary, again seeking treatment for his shoulder. (12(N)(3)(a) ¶ 17.) Nurse Botello arranged for Mr. Higgins' transfer to the infirmary so that he could be observed overnight, and also because Mr. Higgins refused to leave until he saw a doctor. (Id. at ¶ 18.) To determine if there was any nerve or vascular damage in the affected arm, she checked his pulse and sensation. (12(M) ¶ 18.) Everything was normal. (Id.) Nurse Botello testified at her deposition that Mr. Higgins was still behaving normally (with the exception of his persistent requests to see a doctor or to be taken to a hospital). (Id.) Mr. Higgins sat in a chair, as all the beds were occupied and he did not want to lie on the floor. (Id.; 12(N)(3)(a) ¶ 18.) At 9:00 p.m. Mr. Higgins approached Nurse Botello and asked for some Tylenol, which was given to him. (12(N)(3)(a) ¶ 17.) At each of these times, Nurse Botello made notes in Mr. Higgins' file, and each note indicated that his shoulder was "forward and lower than right." (Id.)

Nurse Botello went off duty shortly after midnight and left the infirmary. (Higgins Dep. 82.) Mr. Higgins does not specifically recall her leaving. (Higgins Dep. 82.) During the night, he periodically fell asleep. (Id. at 80.)

The next morning, June 20, 1994, Defendant Dr. Gerald Cerniak arrived in the infirmary to perform his standard sick call.[3] Dr.

---

3. Dr. Cerniak's testimony is entirely based upon his recollection as prompted by his notes—he has

Cerniak's notes indicate that Mr. Higgins would not allow him to examine the shoulder. (12(M) ¶ 24.) Mr. Higgins disagrees with this, claiming that he was so happy to see a doctor that he would have allowed him to do anything. (12(N)(3)(b) ¶ 15.) However, he cannot remember whether Dr. Cerniak attempted to physically examine his shoulder. (Id.) Dr. Cerniak prescribed Ibuprofen for the pain and restricted Mr. Higgins' activity so that no further injury would occur, and so that he could monitor Mr. Higgins' progress and determine exactly what the problem was. (12(M) ¶ 27; Cerniak Dep. 20–21.)

After this, it is unclear what Mr. Higgins did for the rest of his stay at Kane County. After seeing Dr. Cerniak, he did undergo a psychological evaluation from jail psychologist Kris Metcalf, who testified that he saw nothing wrong with Mr. Higgins' shoulder. (12(M) ¶¶ 28–29.) That night, Mr. Higgins fell asleep and awoke the next morning with a normal shoulder. (12(M) ¶ 40.)

## B. *Defendants*

### 1. Nurse Brown

Nurse Brown has been a Licensed Practical Nurse since 1966, and was employed by Kane County, as well as Defendant Correctional Medical Services of Illinois, Inc. ("CMS"), on June 19, 1994. (12(M) ¶ 8.) She testified that her role was to handle nonserious medical needs such as nosebleeds, headaches, and other ailments of that sort. (Id.) For more serious medical needs, she would provide immediate treatment and place the patient on the doctor's list for the next day. (Id.) In the event of an emergency, it was her understanding that she was to contact either a CMS doctor or the Medical Supervisor, then send the patient to the hospital upon supervisory approval. (12(N)(3)(a) ¶ 8.) Nurse Brown is aware of her duties as a Licensed Practical Nurse, and recognizes that, with or without approval, she risks losing her license if she denies emergency medical care when she thought it was necessary. (12(M) ¶ 9.) Nurse Brown never had occasion to transfer an inmate to the hospital. (Id.)

Nurse Brown testified that it was her understanding that the objective signs of a dislocated shoulder include "bones sticking up," sweating, discoloration of the face, swelling around the affected area, and "so much pain it is going to show on [the patient's] face." (12(M) ¶ 10.) Nurse Brown testified that, based upon her observations of Mr. Higgins and his refusal to permit palpation, she did not believe Mr. Higgins to have a dislocated shoulder. (12(M) ¶ 12.)

### 2. Nurse Botello

Nurse Botello is a Registered Nurse who was employed by Kane County and CMS on June 19, 1994. (12(M) ¶ 14.) She testified that her standard procedure in dealing with patients was to first listen to the patient's complaint and then perform a nursing assessment. (Id. at ¶ 15.) The results of that assessment would determine the treatment she would provide. (Id.) If the condition was simple enough and it was permissible for her to treat it, she would do so. (Id.) If the patient required immediate attention, she would contact the doctor on call. (Id.) If the patient required emergency attention, or was in severe pain, she would have the patient transferred to the hospital's emergency room and call the doctor to inform him of the patient's status. (Id.) It is not her understanding that she was required to seek supervisory approval before transferring patients to the hospital. (Botello Dep. 26.) Only once did she ever transfer a patient to the emergency room during her three-year tenure with CMS and Kane County. (12(N)(3)(a) ¶ 15.)

Nurse Botello testified that it was her understanding that every case of a dislocated shoulder would be presented with the symptoms of "pain, swelling and an obvious deformity to the shoulder." (12(M) ¶ 16.) She would also look for other indices, such as sweating, inability to speak or walk normally (Id. at ¶ 17), reduced or absent pulse, and reduced or absent sensation in the affected arm. (12(M) ¶ 18.) Based upon her observations and physical examinations [4] of Mr. Hig-

---

no independent recollection of ever seeing or treating Mr. Higgins. (12(N)(3)(a) ¶ 21.)

4. Mr. Higgins did permit her to take his left radial pulse (wrist) and to gently tap his left hand

gins, Nurse Botello concluded that Mr. Higgins was not suffering from a dislocated shoulder, and, therefore, did not need to be sent to the emergency room. (Id. at ¶ 19.)

### 3. Dr. Cerniak

Dr. Cerniak is a board-certified general surgeon who was employed by Kane County and CMS on June 20, 1994. (12(M) ¶ 20.) Dr. Cerniak has a great deal of experience treating shoulder ailments, including the treatment of over one hundred dislocations in his thirty years as a physician. (Id.)

Dr. Cerniak has testified that he understands the objective indices of a dislocated shoulder to vary, depending upon which type of dislocation is present, but one sign is a "mass production [*sic*]" visibly sticking out of the shoulder area. (12(M) ¶ 23; Cerniak Dep. 26.) Dr. Cerniak is unable to diagnose a shoulder dislocation without examining the patient. (12(M) ¶ 23.) His preferred examination is to first take a history from the patient, to discover the problem and the cause; visually examine the patient, checking for symmetry between the shoulders; and finally, physically examine the patient, first palpating the affected area to find bruising, swelling, and bone location, then (if possible) carefully moving the arm to test the patient's range of motion. (12(M) ¶¶ 22–23.) Only after all of this is done is Dr. Cerniak able to make a diagnosis. (Id. at ¶ 23.) Dr. Cerniak has no independent recollection of his encounter with Mr. Higgins, but his notes indicate that Mr. Higgins would *not* permit Dr. Cerniak to examine his shoulder. (Id. at ¶ 24) Mr. Higgins disagrees, claiming that he "was so happy to see the doctor finally that [he] would have let him [examine the shoulder]." (Higgins Dep. 89.) However, Mr. Higgins is unable to recall whether Dr. Cerniak actually attempted to examine his shoulder. (Id.)

### 4. CMS

CMS is the contractual medical service provider for Kane County. (12(M) ¶ 33.) CMS has an agreement with Mercy Center (Aurora, Illinois) and Delnor Community Hospital (Geneva, Illinois) for providing Kane County inmates with emergency and non-emergency outpatient treatment. (Id. at ¶ 34.)

### C. *Procedural History*

Mr. Higgins initiated this action, pro se, on July 20, 1995. His Second Amended Complaint, filed June 17, 1996, contained two counts. In relation to the handcuffing incident of June 16, 1994, the first count alleged that police officers James Mitchell and Todd Exline deprived him of his constitutional rights as applied to the States by the Fourteenth Amendment.

In relation to the treatment of the shoulder dislocation, the second count alleges that Nurses Brown, Botello, and Dr. Cerniak were deliberately indifferent to Mr. Higgins' serious medical need, thus depriving him of his constitutional rights as applied to the States by the Fourteenth Amendment. Furthermore, Mr. Higgins alleges CMS employed a "policy and practice of [denying] medical treatment to pretrial detainees who were being transferred from the Kane County Jail to other correctional facilities in order to pass the expense [along] ... to the other correctional facilities," thus depriving him of his constitutional rights. (Second Amended Complaint ¶ 23.)

The district court appointed counsel on May 1, 1996. Mr. Higgins voluntarily dismissed Count I of the Second Amended Complaint against the officers on August 2, 1996, continuing his action against only the present Defendants. On February 14, 1997, Defendants consented to proceed before a United States Magistrate Judge. Defendants filed the current Motion for Summary Judgment on April 6, 1998.

### DISCUSSION

### A. *Standard for Summary Judgment*

Summary judgment is appropriate when "there is no genuine issue as to any material

---

to check for vascular and nerve damage. (12(M) ¶ 18.) The record does not indicate whether Nurse Botello attempted to palpate the shoulder.

Mr. Higgins does not believe she attempted to palpate the shoulder. (Higgins Dep. 64.)

fact, and ... the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A dispute about a material fact is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The movant bears the initial burden of identifying "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)(quoting FED. R. CIV. P. 56(c)).

The burden then shifts to the respondent, who "cannot rest on the pleadings alone, but must identify specific facts to establish that there is a genuine triable issue." *Cornfield by Lewis v. Consolidated High Sch. Dist. No. 230*, 991 F.2d 1316, 1320 (7th Cir.1993). If the respondent fails to make such a showing, the movant may then be entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548.

The evidence presented must be viewed in the light most favorable to the opposing party. *Smith v. Severn*, 129 F.3d 419, 426 (7th Cir.1997). Any ambiguities and inferences should be drawn in favor of the non-movant, but the Court is "not required to draw every conceivable inference from the record [in favor of the non-movant]—only those inferences that are reasonable." *Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991). Furthermore, if the non-moving party fails to contest the moving party's Local Rule 12(M) statement, such failure is a binding admission of those facts to the extent that they are uncontested. *Severn*, 129 F.3d at 425.

**B. *42 U.S.C. § 1983; the Eighth Amendment***

■ 42 U.S.C. § 1983 provides a cause of action against state actors for alleged vio-

lations of a plaintiff's constitutional rights.[5] *Farmer v. Brennan*, 511 U.S. 825, 841, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). It is well settled that "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney*, 509 U.S. 25, 31, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). Specifically, courts are concerned with the "cruel and unusual punishment" clause of the Eighth Amendment. *Farmer*, 511 U.S. at 832, 114 S.Ct. 1970. Pre-trial detainees derive the same Eighth Amendment protections as convicts through the due process clause of the Fourteenth Amendment. *See Hall v. Ryan*, 957 F.2d 402, 405 (7th Cir.1992) ("Although pretrial detainees cannot be punished ... [their] due process rights ... are at least as great as the Eighth Amendment protection available to a convicted prisoner.") (citation omitted); *see also Salazar v. City of Chicago*, 940 F.2d 233, 237 ("If [the prisoner] was in custody ... [and] not free to seek other forms of assistance—then the paramedics might be liable for violating [his] right to due process by failing to treat his injuries."). Prisoners' various rights under the Eighth Amendment change with " 'the evolving standards of decency that mark the progress of a maturing society,' " and are violated when an act is " 'repugnant to the conscience of mankind.' " *Estelle v. Gamble*, 429 U.S. 97, 102, 105, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (citations omitted). Included in those rights is the entitlement to adequate medical care. *Farmer*, 511 U.S. at 832, 114 S.Ct. 1970; *see also Wellman v. Faulkner*, 715 F.2d 269, 271 (7th Cir.1983) (the state has an affirmative obligation "to provide persons in its custody with a medical care system that meets minimal standards of adequacy.").

■ At this juncture in society's evolution, within the context of medical treatment denied to inmates, the requirements of this country's collective conscience are clear: (1) the prisoner must have a "serious medical

---

5. 42 U.S.C. § 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory ... subjects, or causes to be subjected, any citizen of the United States or other person within

the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

need," and (2) the prison officials must act with "deliberate indifference" to that need. *Estelle*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (first appeared); *Farmer*, 511 U.S. at 834, 114 S.Ct. 1970 (seminal case). This is a conjunctive test. On a motion for summary judgment, eliminating just one prong will be fatal to·the non-movant's defense. Therefore, to survive this motion for summary judgment, Mr. Higgins must show sufficient evidence to permit a reasonable jury to draw the inference that he had both a serious injury (or serious risk thereof), *and* that each Defendant possessed the requisite state of mind.

### 1. Serious Medical Need

 A prisoner's condition which, left untreated, could result in further significant injury that would be an " 'unnecessary and wanton infliction of pain,' " is a serious medical need. *Estelle*, 429 U.S. at 102, 97 S.Ct. 285 (quoting *Gregg v. Georgia*, 428 U.S. 153, 182–83, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). Such injury or pain cannot arise from discomfort that is "part of the penalty that criminal offenders pay for their offenses against society." *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). Conditions that could result in permanent disablement or lingering pain are sufficiently serious medical needs. *Estelle*, 429 U.S. at 104, 97 S.Ct. 285.

██ In the present case, it is uncontested that a dislocated shoulder constitutes a serious medical need. Nurses Brown and Botello, Dr. Cerniak, and Plaintiff's expert, Dr. Loughran, all agree that nerve and vascular damage is a concern with every dislocated shoulder. Generally, a dislocated shoulder is an unpleasant experience that could have some potentially damaging results (including the permanent incapacitation of the limb) if not properly and quickly treated.

There is some doubt, though, as to whether Mr. Higgins' left shoulder was actually dislocated while he was in Defendants' care. There were no diagnoses of a dislocated shoulder during this period. The three individual Defendants testified that they, based upon their medical training and knowledge, did not conclude that Mr. Higgins was suffering from a dislocated shoulder during the period in question.[6] On the other hand, Mr. Higgins has proffered his own sworn statements that he believed his shoulder to be dislocated from the morning of June 19, 1994 until the night of June 20, 1994.[7] Mr. Higgins also provides the sworn testimony of Vincent Taylor, one of presumably dozens of inmates who saw and interacted with him during this period, that Mr. Higgins was "in a lot of pain, you know, a lot of ... moaning ... [and his shoulder] was, like, hanging down a little bit on his—you know, and kind of sticking out." (Taylor Dep. 7–8.) Finally, Mr. Higgins provides the Court with the expert testimony of a licensed orthopedic surgeon, Dr. Audley Loughran, who, based upon the examination of x-rays taken before and after the period in question, concluded that a dislocation probably did occur during the time between the taking of the two x-rays; however, he could not give an exact date as to when the dislocation occurred. (12(M) ¶ 55; 12(N)(3)(a) ¶ 55.)

Based upon the foregoing evidence, this Court cannot grant summary judgment on the serious injury issue because, since it is not clear there was a shoulder dislocation, there is a question as to whether Mr. Higgins suffered a "serious" injury.

6. Defendants mainly argue that Mr. Higgins' course of conduct during this period should be dispositive of the severity of the alleged injury. They call attention to facts such as Mr. Higgins' failure to obtain treatment for his shoulder until eight and a half hours after he decided it was dislocated, his refusal (despite his alleged excruciating pain) to permit the physical examination of his shoulder by anyone, even "the president," and the fact that he could sleep with this torturous injury wedged into the arm of a chair. While this behavior does seem inconsistent with what is expected of someone suffering from a dislocated shoulder, the test for a serious medical need is still an objective one; patients can behave in seemingly strange ways depending upon their individual pain thresholds.

7. Mr. Higgins' "diagnosis" is based upon his personal experience with shoulder dislocations. The Court finds it interesting, though, that Mr. Higgins previously claimed that the same dislocation occurred on June 16, 1994, the day he was handcuffed. (12(M) ¶ 2.)

### 2. Deliberate Indifference

■ In addition to the serious injury requirement, medical personnel also must be "deliberate[ly] indifferen[t]" to the prisoner's condition for a plaintiff to prevail. *Estelle,* 429 U.S. at 106, 97 S.Ct. 285. The Supreme Court explicitly held, on constitutional grounds, that "subjective recklessness as used in the criminal law is ... [the appropriate] test for 'deliberate indifference' ...." *Farmer,* 511 U.S. at 839, 114 S.Ct. 1970. The medical officer must know that there is a serious injury or risk of permanent disablement, and then must consciously disregard that risk. *Id.* at 837, 114 S.Ct. 1970. Arguments that the medical officer did not comply with the objective standard of care will be of no avail to the complainant. *Farmer,* 511 U.S. at 838, 114 S.Ct. 1970 ("[A]n official's failure to alleviate a significant risk that he *should have perceived* but did not, while no cause for commendation, cannot ... be condemned as the infliction of punishment.") (emphasis added). In the medical context, a physician's diagnosis of a condition is presumptively representative of the physician's state of mind. *Cole v. Fromm,* 94 F.3d 254, 261 (7th Cir.1996), *cert. denied,* — U.S. ——, 117 S.Ct. 945, 136 L.Ed.2d 834 (1997) ("diagnosis is, by definition, [the doctor's] subjective conclusion ....").

■ There are three ways to show the medical officers' state(s) of mind here. First, Mr. Higgins can show direct evidence of reckless intent, such as admissions or diagnoses. Second, medical officers can be found liable if they strongly believe the risk or condition to be present, and, but for their failure to perform verifying measures or tests, they avoid actual knowledge. *Farmer,* 511 U.S. at 843 n. 8, 114 S.Ct. 1970. Third, actual knowledge can be imputed by virtue of the condition's obvious nature. *Id.* at 842, 114 S.Ct. 1970 ("Whether a prison official had the requisite knowledge ... is a question of fact subject to demonstration in the usual ways ... and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.").

Thus, Mr. Higgins must come forth with some evidence that shows the Defendants *actually knew* about the dislocation and then failed to do anything about it. This Opinion will first address the three individual Defendants (Brown, Botello, and Cerniak), and then separately address the conspiracy theory alleged against CMS.

#### a. Direct Evidence of Actual Knowledge

At deposition, Defendants all testified that they, based upon their observations and in light of their medical knowledge, did not believe Mr. Higgins to be suffering from a dislocated shoulder. There is nothing in the record which indicates actual knowledge on the part of any of the defendants. No one diagnosed Mr. Higgins with a dislocated shoulder. No one administered treatment that would typically be administered for a dislocated shoulder.

Mr. Higgins disputes none of this, and proffers no direct evidence whatsoever to contradict the conclusion that Defendants had no actual knowledge.

#### b. Showing a Strong Belief and Disregarding Professional Standards

■ While it is unclear from the documents he submitted to this Court, Mr. Higgins seems to argue that Defendants should have at least taken steps to confirm his injury so that he could receive proper treatment. He insists that they should have taken x-rays to see if the shoulder was dislocated. Such allegations echo the losing argument in *Estelle:*

'Certainly an x-ray of [Gamble's] lower back might have been in order and other tests conducted that would have led to appropriate diagnosis and treatment for the daily pain and suffering he was experiencing.' ... But the question whether an X-ray—or additional diagnostic techniques or forms of treatment—is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice ....

*Estelle,* 429 U.S. at 107, 97 S.Ct. 285 (alteration in original) (citation omitted). The Seventh Circuit elaborated on this position,

stating that "deliberate indifference may be inferred based upon a medical professional's erroneous treatment decision *only* when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Cole,* 94 F.3d at 261–62 (emphasis added). Furthermore, differences in opinion between the patient and the doctor never give rise to a constitutional claim. *Id.* at 261.

The evidence does not establish any professional standard for the diagnosis and treatment of dislocated shoulders. All that is offered are the various opinions of Nurses Brown and Botello, and Doctors Cerniak and Loughran, all of whom agree that it is preferred to palpate a patient's shoulder to confirm the existence of a dislocation. Furthermore, Mr. Higgins' expert witness, Dr. Loughran, testifies that a failure to order an x-ray when the patient refuses to permit a physical examination is, at worst, an "error in judgment." (12(M) ¶ 60.) Based upon this evidence, it cannot be reasonably concluded that Defendants' decision to not order x-rays of Mr. Higgins' shoulder so departed from accepted professional judgment as to give rise to a constitutional violation of Mr. Higgins' rights.

▮ Mr. Higgins alleges more specifically that the Defendants at least should have suspected an injury, and, therefore, should have done something. However, medical professionals can only be held liable if they *strongly* suspect a condition to be present, and, but for the failure to perform a confirming examination, would actually know the condition was present. *Farmer,* 511 U.S. at 843 n. 8, 114 S.Ct. 1970. Mr. Higgins presents no facts that suggest any Defendant subjectively and *strongly* suspected that his shoulder was dislocated. Furthermore, his constant refusal to permit any of the Defendants to palpate his arm, the preferred method for confirming or dispelling any doubts as to the condition of an alleged dislocated shoulder, is an effective bar to any liability under this theory.

### c. *Actual Knowledge Imputed through "Obviousness"*

▮ In *Farmer,* the Supreme Court adopted the subjective test of criminal recklessness to determine "deliberate indifference." *Farmer,* 511 U.S. at 839, 114 S.Ct. 1970. However, "[w]hether a prison official had the requisite knowledge ... is a question of fact subject to demonstration in the usual ways ... and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 842, 114 S.Ct. 1970.

Courts have approached this "obviousness" method of proving deliberate indifference with much trepidation. The Supreme Court attempted to clarify the standard in *Farmer,* explaining that evidence of a "longstanding, pervasive, well-documented" condition might be sufficient to impute actual knowledge. *Farmer,* 511 U.S. at 842, 114 S.Ct. 1970. The Seventh Circuit tackled the obviousness test along these lines in *Cole,* where a decedent's estate sued a prison psychiatric ward because the decedent had suffocated himself with a plastic trash-bag left in his room while he was under a suicide watch. *Cole,* 94 F.3d at 257. The *Cole* court acknowledged the guidelines provided by *Farmer,* but declined to conclude that the mere presence of plastic bags, coupled with a doctor's knowledge that suicidal types often suffocate themselves, presented an obvious risk to the decedent. *Id.* at 261.

The present case also weighs the judgment of medical professionals against the obviousness of a condition. Mr. Higgins argues that, because his shoulder was sagging down and pushed forward, it was possible that "a reasonable jury could conclude that [the individual Defendants] knew the plaintiff's shoulder was dislocated ...." (12(N)(3)(a) ¶ 24.) Furthermore, the Court notes that his attempt to impute knowledge to all Defendants is based upon the observations of Nurse Botello and fellow inmate Vincent Taylor, who was never present with Mr. Higgins when he saw any of the Defendants. One cannot reasonably impute knowledge to another through the observations of a third party.

Mr. Higgins' stipulation that a jury *could* infer the existence of a dislocation falls far

short of an assertion that there must be a dislocation. For something to be truly obvious, a consideration of the underlying facts will necessarily lead to a single conclusion. Mr. Higgins' argument suggests that other conclusions could be drawn. Indeed, none of the individual Defendants concluded that Mr. Higgins' shoulder was dislocated; Nurse Botello concluded that he was "playing around." (Botello Dep. 43; 12(M) ¶ 17.) Even Mr. Higgins' vacillation regarding the time of the dislocation (the 16th or the 19th) suggests that there is some difficulty identifying the condition. This Court has already stated that there is some question as to whether the record even establishes the actual existence of the alleged injury. There is repeated medical testimony that it is impossible to diagnose a shoulder dislocation through visual examination only; some sort of physical examination is required. With this evidence before the Court, Mr. Higgins cannot possibly successfully maintain that his alleged injury was obvious for the purpose of imputing knowledge to the individual Defendants.

Therefore, the threshold issue of obviousness has not been established, and it follows that subjective knowledge cannot be imputed.

Mr. Higgins has failed in all possible ways to establish the requisite mental state of "deliberate indifference" in the individual Defendants.

### 3. The CMS Conspiracy

Liability for actions alleged under 42 U.S.C. § 1983 cannot be predicated on the doctrine of respondeat superior. *Vance v. Peters,* 97 F.3d 987, 990 (7th Cir.1996), *cert. denied,* — U.S. —, 117 S.Ct. 1822, 137 L.Ed.2d 1030 (1997). Governmental entities can only incur liability under § 1983 "when the 'execution of the government's policy or custom ... inflicts the injury.'" *Vukadinovich v. McCarthy,* 901 F.2d 1439, 1443 (7th Cir.1990) (quoting *Monell v. Department of Soc. Serv. of City of New York,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). Private entities can be held liable as state actors under § 1983 only if they perform "functions that are 'traditionally the exclusive prerogative of the State.'"

*Wade v. Byles,* 83 F.3d 902, 905 (7th Cir.), *cert. denied,* — U.S. —, 117 S.Ct. 311, 136 L.Ed.2d 227 (1996) (quoting *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 353, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974)). Here, CMS is contractually obligated to provide Kane County inmates with the medical care mandated by the Eighth Amendment; therefore, CMS can be held liable for constitutional violations under § 1983.

In the present case, Mr. Higgins alleges that CMS, to save money, established a policy to deny medical treatment to inmates who were soon to be transferred, thus denying Mr. Higgins his constitutional right to be free of the cruel and unusual punishment of not having his shoulder reset. In support of this allegation, Mr. Higgins offers the testimony of Nurse Brown, who states that it is her understanding that the policy of having nurses seek approval before sending inmates to the hospital exists to keep costs down. Additionally, Mr. Higgins also testifies that Dr. Cerniak asked him whether he was going to be transferred. Finally, Mr. Higgins notes that only one inmate was ever sent to the hospital under the collective care of Nurse Botello, Nurse Brown, and Dr. Cerniak.

At best, it is fanciful to assert that the record establishes a malevolent scheme to deprive prisoners of the adequate medical care Kane County and CMS are obligated to provide. Plaintiff's evidence is representative of only an extremely small portion of CMS' total work force. Nurse Botello and Dr. Cerniak testified that they could unilaterally send any inmate to the hospital. Even if there was a procedural check in place requiring authorization to transfer inmates to the hospital, the Court notes that "[p]rison administrators ... [are] accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to ... maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Extra security measures are to be expected, so long as they are within the bounds of the Eighth Amendment. Furthermore, it is the function of every organization to be cost-effective, so it is not surprising that CMS would encour-

age second opinions before incurring the expense of transferring prisoners to the hospital.

Mr. Higgins needs to show evidence which specifically demonstrates that CMS conspired to deny transferees medical care. Instead, he only shows evidence that, on a very general level, CMS took minimal steps to keep prisoners from being sent to hospitals without good cause. This is not a conspiracy; rather, it is just good sense.

The evidence presented is simply insufficient to create a reasonable inference that CMS conspired to keep transferees from receiving adequate medical care.

## CONCLUSION

There are no genuine issues of material fact as to Plaintiff's claim of his deprivation of his constitutional rights. Defendants are entitled to judgment as a matter of law.

IT IS **THEREFORE ORDERED** that:

Defendant's Motion for Summary Judgment be, and the same hereby is, **GRANTED.**