94 F.3d 254
 The ESTATE OF Max G. COLE, by its Administratrix Lois
PARDUE, and Lois Pardue, Plaintiffs-Appellants,
v.
Jackie FROMM, Phill Spires, Dan Beck, Katie Grier Easton,
Clement Morris, and Nancy Butler, Defendants-Appellees.
 No. 95-4087.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 18, 1996.
Decided Aug. 12, 1996.
 
 Hamid R. Kashani (argued), Indianapolis, IN, David A. Nowak, Columbus, IN, for Estate of Max G. Cole, Lois Pardue.
 Robert W. Wright, Burton M. Harris (argued), Mary M. Lueders, Locke, Reynolds, Boyd & Weisell, Indianapolis, IN, for Jackie Fromm.
 Robert W. Wright, Burton M. Harris (argued), Locke, Reynolds, Boyd & Weisell, Indianapolis, IN, for Phill Spires, Dan Beck, Katie Grier Easton, Clement Morris.
 Burton M. Harris, Locke, Reynolds, Boyd & Weisell, Indianapolis, IN, Robert J. Shula, Catherine Mannweiler Treen (argued), Lowe, Gray, Steele & Darko, Indianapolis, IN, Richard S. Pitts, Hoffman, Drewry, Hancock & Simmons, Indianapolis, IN, for Nancy Butler.
 Before BAUER, ESCHBACH, and FLAUM, Circuit Judges.
 ESCHBACH, Circuit Judge.
 
 
 1
 Plaintiffs-Appellants estate of Max G. Cole and Lois Pardue, Cole's mother, ("plaintiffs") appeal from entry of summary judgment in favor of defendants. Max Cole was a pretrial detainee confined to an acute care inpatient psychiatry unit at Wishard Memorial Psychiatry Ward in Indianapolis in July, 1991. Cole committed suicide by asphyxiating himself with a plastic sanitary bag which was used to line a linen hamper in the psychiatry ward. Plaintiffs brought suit against a number of health care providers who assisted in Cole's treatment in one way or another. Defendant Jackie Fromm was a registered nurse, defendant Katie Grier Easton was a graduate nurse, and defendants Phill Spires, Dan Beck, and Clement Morris were nursing mental health clinicians (collectively, the "nurses"). Defendant Dr. Nancy Butler was a licensed psychiatrist and served as the Inpatient Director and a staff psychiatrist.
 
 
 2
 Plaintiffs claim that defendants violated Max Cole's due process rights under the Fourteenth Amendment because they were "deliberately indifferent" to the risk that Cole would commit suicide while in their care and that defendants are liable for damages under 42 U.S.C. § 1983. This action was originally instituted in state court. It was removed to federal court by defendants. Defendants moved to dismiss for lack of subject matter jurisdiction and filed motions for summary judgment. The district court granted defendants' motions for summary judgment. We affirm the district court's entry of summary judgment in favor of defendants.
 
 I.
 
 3
 We review the grant of summary judgment de novo. Many of the facts in this case are undisputed. We draw all reasonable inferences from these facts in favor of the non-moving party, here the plaintiffs. Williams v. Ramos, 71 F.3d 1246, 1248 (7th Cir.1995). We review the remaining, disputed evidence in the light most favorable to plaintiffs and affirm only if no genuine issue of material fact exists. Fed.R.Civ.P. 56. With the appropriate standard of review in mind, we discuss the relevant facts.
 
 
 4
 Max Cole was transferred to Wishard because he was "running face first into walls" at the Marion County Jail and had been in a fight with another inmate. Upon his arrival at Wishard Memorial Hospital (the "Hospital"), Cole was treated for abrasions to his face and forehead. Cole was agitated, out of control, and attempted to leave the emergency room. Cole, therefore, was placed in restraints. Dr. Verkota Rao, a physician specializing in psychiatry, evaluated Cole and determined that he was experiencing symptoms of a drug-induced psychosis. Rao ordered Cole admitted to the Hospital in the BU2 unit, a small and secured unit reserved for unstable patients with acute psychiatric problems. Rao prescribed an antipsychotic drug for Cole and placed Cole on potential assault, suicide, and elopement precautions at the time of his admission.
 
 
 5
 Dr. Butler, a board certified psychiatrist and the Hospital's Medical Director of In-Patient Psychiatry, was Cole's attending physician. On July 2, the day after Rao's evaluation and Cole's admittance to the Hospital, Dr. Butler reviewed Cole's medical chart and conducted an independent mental status examination. Cole was depressed and reported having hallucinations telling him to commit suicide. Dr. Butler committed Cole to the BU2 unit. Dr. Butler classified Cole as "potentially suicidal," the lower of the two levels of suicide precautions. Dr. Butler did not believe that Cole was a "high risk" patient even though Cole reported to Dr. Butler that he heard voices telling him to commit suicide, because Cole did not express a present intent to commit suicide. In addition, Cole spoke logically and coherently, Dr. Butler felt that his hallucinations were directed mostly toward hurting others, and Cole disavowed a desire to act on his hallucinations. Dr. Butler concluded that Cole's behavior was more likely caused by drug-induced psychosis than by a personality disorder.
 
 
 6
 The Hospital has two levels of precautions for patients with possible suicidal tendencies. These levels are labelled "potential suicide precautions" and "high risk suicide precautions." The Hospital requires that a doctor make the decision to institute or to discontinue either of these precautions. The purpose of the "potential suicide precautions" is to "provide ongoing assessment and intervention of patients who exhibit or verbalize suicidal ideations." The policy requires "close observation" and regular, but not constant, monitoring of the patient by the caregiver. Patients subject to "potential suicide precautions" generally move freely about the BU2 unit and they have access to the restrooms. The policy requires Hospital staff to conduct an initial search for contraband of the areas to which the patient has access and additional searches thereafter on an "as needed" basis.
 
 
 7
 The purpose of "high risk" suicide precautions is to "provide a safe and therapeutic environment for those patients who exhibit or verbalize serious suicidal intention." Hospital staff provides continuous one-to-one monitoring of patients that are classified "high risk." In addition, the staff carefully searches the patient's room, locker, and personal belongings for contraband both upon initiation of the precautions and during every shift thereafter. None of the nursing defendants had any input into, or responsibility for, the creation or development of the Hospital's suicide risk classification policy. Dr. Butler approved the suicide risk classification policy for implementation.
 
 
 8
 Dr. Butler last examined Cole on July 3, 1991. Dr. Butler's opinion at that time was that Cole did not need a change in his precautions because he did not exhibit signs suggesting that he was contemplating suicide. On July 4, at 9:55 p.m., Cole came to the dayroom and requested a cigarette from nurse Fromm. Fromm gave Cole a cigarette and Cole told her that he felt better. About 25 minutes later, Cole was found to have committed suicide in his room. Cole was in his bed with the sheets covering himself and he had a plastic bag over his head.
 
 
 9
 The nursing defendants testified that they knew that the Hospital used plastic bags to line the soiled linen hampers in the two restrooms in the BU2 unit. The Hospital's policy that requires use of the plastic liners was designed to comply with Indiana State Board of Health regulations governing communicable disease control policies. Dr. Butler testified at her deposition that she was not aware that the plastic bags were used in the restroom, but we assume for purposes of this appeal that a reasonable jury could have found that she was aware of the plastic bags. Several of the defendants, including Dr. Butler, admitted that they were aware that plastic bags can be used for committing suicide and all of the nursing defendants admitted that they would have confiscated a plastic bag from Cole if they had witnessed him obtaining it, which they did not.
 
 
 10
 There is no evidence, however, that any defendant perceived the presence of the plastic bags in the BU2 unit to be a danger to Cole or other patients. In addition, no person who had worked in the BU2 unit, visited it, or inspected it had ever recognized that the bags posed a risk to the patients and no person had called such risk to the Hospital's attention. Finally, there was no evidence that any BU2 unit patient had ever tried to harm himself or herself with a plastic bag prior to Cole's suicide.
 
 II.
 
 11
 In Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), the Supreme Court held that a prison official may be held liable under the Eighth Amendment for acting with "deliberate indifference" to inmate health or safety only if he knows that the inmate faces a "substantial risk of serious harm" and disregards that risk by failing to take reasonable measures to abate it. The Court rejected an objective test for deliberate indifference and held that liability will lie only if "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at ----, 114 S.Ct. at 1979. The Court adopted the definition of "reckless" as defined in criminal law, which "permits a finding of recklessness only when a person disregards a risk of harm of which he is aware." Id. at ---- - ----, 114 S.Ct. at 1978-79. The Court determined, however, that a plaintiff may establish subjective awareness of the risk by proof of the risk's obviousness.
 
 
 12
 Whether a prison official had the requisite knowledge of a substantial risk if [sic] a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, ... and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.
 
 
 13
 Id. at ----, 114 S.Ct. at 1981 (citations omitted).
 
 
 14
 In the instant case, Cole was not a prisoner, he was a pre-trial detainee. We have previously held that the due process rights of a pre-trial detainee are at least as great as the Eighth Amendment protection available to a convicted prisoner,[1] and defendants may be liable for Cole's suicide if they were deliberately indifferent to a substantial suicide risk. Hall v. Ryan, 957 F.2d 402, 405-06 (7th Cir.1992); see also Murphy v. Walker, 51 F.3d 714, 717 (7th Cir.1995) ("Pretrial detainees, who are protected by the Due Process Clause, will state a claim for inadequate medical treatment if they allege deliberate indifference to their serious medical needs." (internal quotation and citation omitted)); Salazar v. City of Chicago, 940 F.2d 233, 237-41 (7th Cir.1991) (deliberate indifference standard applies to pre-trial detainee). Plaintiffs note that they are not required to establish that defendants intended to harm Cole. See Haley v. Gross, 86 F.3d 630, 641 (7th Cir.1996). They must establish only that defendants were aware of a substantial risk of serious injury to Cole but nevertheless failed to take appropriate steps to protect him from a known danger.
 
 
 15
 Plaintiffs' theory is that the defendants knew that Cole was a suicide risk; they knew that plastic sanitary bags in the unit were accessible to Cole; they knew that the bags presented a serious risk of harm to Cole; and, they took no steps either to object to the availability of the plastic bags, to transfer Cole out of the psychiatric unit, or to increase the monitoring of him. Therefore, plaintiffs claim that defendants knowingly or recklessly disregarded a substantial risk of serious harm to Cole.
 
 
 16
 Plaintiffs cannot survive summary judgment in this case based upon allegations of medical malpractice. A prisoner (or, in this case, a pretrial detainee) cannot establish a § 1983 claim based upon inadequate medical care when the care provided is negligent. Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976); Sellers v. Henman, 41 F.3d 1100, 1102 (7th Cir.1994). Plaintiffs must establish the medical officer's "deliberate indifference" to the patient's "serious medical needs." Estelle, 429 U.S. at 106, 97 S.Ct. at 292; see also Steele v. Choi, 82 F.3d 175, 178 (7th Cir.1996) (discussing difference between "negligent treatment" and "deliberate indifference"), petition for cert. filed (U.S. Aug. 1, 1996) (No. 965423); Williams v. O'Leary, 55 F.3d 320, 324 (7th Cir.), cert. denied, Williams v. Brewer, --- U.S. ----, 116 S.Ct. 527, 133 L.Ed.2d 434 (1995).
 
 
 17
 Plaintiffs' claim that the district court erred in granting summary judgment rests upon the affidavit of their expert, Dr. Davis. Dr. Davis stated that the use of plastic bags in the BU2 unit created a substantial risk of serious harm to patients like Cole:
 
 
 18
 The danger presented by the plastic bags in the trash can and the laundry hamper on the BU2 unit was obvious and significant, and constituted a substantial risk of serious harm, and significant risk of death, to a "potential suicide" patient such as Mr. Cole.
 
 
 19
 Davis concluded that the defendants did not adhere to a professional standard of medical care by failing to remove Cole, failing to object to the presence of the bags, and by failing to monitor him more closely.
 
 
 20
 Plaintiffs focus on Dr. Davis's statement that the risk to Cole presented by the plastic bags was "obvious." Plaintiffs contend that this statement creates a genuine issue of material fact regarding whether the defendants were subjectively aware of the risk posed by the plastic bags. Plaintiffs rely on the Supreme Court's statement in Farmer that whether a defendant was "deliberately indifferent" is a question of fact that is "subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Farmer, 511 U.S. at ----, 114 S.Ct. at 1981 (citations omitted). Plaintiffs argue that Dr. Davis's testimony permits a reasonable factfinder to infer that the defendants "knew of a substantial risk" and were therefore deliberately indifferent. Plaintiffs concede that the inference is not conclusive (that is, a jury may reject the evidence), but they argue that it is sufficient to defeat a motion for summary judgment.
 
 
 21
 The district court judge rejected plaintiff's argument based on the fact that this type of harm had not occurred before in this Hospital.
 
 
 22
 In this case, however, the evidence might be sufficient to allow a jury to find that the defendants should have recognized the risk, but it does not reasonably permit an inference that any of these defendants was actually aware of the risk. Farmer holds that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." [Farmer, 511 U.S. at ----] 114 S.Ct. at 1979. This is not a case where the risk was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, [nor in which] the circumstances suggest that the defendant-official being sued has been exposed to information concerning the risk and thus 'must have known' about it." [Id. at ----, 114 S.Ct.] at 1981.... Where there is no evidence that anyone had recognized the risk before, Dr. Davis' opinion that the risk should have been obvious to the defendants would not allow a jury to infer reasonably that any of the defendants actually recognized the risk and chose to do nothing about it.
 
 
 23
 District Court Order, at p. 20-21.
 
 
 24
 Although we reach the same result as the district court, we clarify that proof that the defendant had the requisite knowledge of substantial risk through circumstantial evidence of the risk's obviousness does not require evidence of past injury caused by the same risk or evidence that a defendant had recognized the risk before. The Supreme Court addressed this argument in Farmer and stated that "a subjective approach to deliberate indifference does not require a prisoner seeking a remedy for unsafe conditions to await a tragic event such as an actual assault before obtaining relief." Farmer, 511 U.S. at ----, 114 S.Ct. at 1983 (citations and internal quotations omitted). Plaintiff also need not prove that the defendant "has been exposed to information concerning the risk." Those facts will permit the jury to infer subjective awareness of a substantial risk of serious harm, but they are not required. "[A]ctual knowledge of a substantial risk of serious harm can be inferred by the trier of fact from the obviousness of the risk...." Haley, 86 F.3d at 641.
 
 
 25
 With this in mind, we find that plaintiffs did not create a genuine issue of material fact regarding whether defendants were subjectively aware that Cole would try to commit suicide. Suicide is a "serious harm" and defendants concede that plastic bags pose a substantial risk to a patient that is intent upon committing suicide. Acknowledging that plastic bags pose a substantial risk to a patient who intends to commit suicide, however, begs the question whether defendants were subjectively aware that this plaintiff intended to commit suicide.
 
 
 26
 In the instant case, Dr. Butler placed Cole on "potential" suicide precautions, the lower of two levels of suicide precautions. Dr. Butler balanced the risks that a "potential" suicide patient faced and determined, in essence, that there was not a "substantial risk of serious harm" given the precautions attendant to a placement on "potential" suicide status. Cf. State Bank of St. Charles v. Camic, 712 F.2d 1140, 1146 (7th Cir.) ("deliberate indifference" standard is met only where there was a strong likelihood, rather than a mere possibility, that serious harm would occur), cert. denied, 464 U.S. 995, 104 S.Ct. 491, 78 L.Ed.2d 686 (1983). Cole was not monitored every second, but the staff undertook precautionary activities, including: conducting a contraband search at the beginning of each shift of each patient's room, locker and personal belongings; hourly assessment and observation; and, hourly "hall checks" to monitor the patient's movement.
 
 
 27
 Dr. Butler made a medical judgment that Cole did not need the suicide precautions attendant to "high risk suicide" classification. This diagnosis is, by definition, Butler's subjective conclusion regarding the risk Cole posed to himself. Dr. Butler determined that there was some risk that Cole would try to commit suicide with the bags[2] (thus the "potential suicide precautions") or any of the other myriad objects that were both available to Cole and capable of producing the desired result. Plaintiffs do not argue, and they put forth no evidence, that Dr. Butler misdiagnosed Cole. As the district court noted, plaintiffs assume that, because there was some risk of suicide, defendants were obligated to take any available measures to protect Cole from himself. We cannot permit the factfinder to infer subjective knowledge of a substantial risk that Cole would harm himself based on Dr. Davis's testimony that the risk was "obvious" because this would conflict with Dr. Butler's subjective medical judgment, evidenced by her diagnosis, the appropriateness of which plaintiffs do not challenge.
 
 
 28
 Even if we assume that plaintiffs challenge the appropriateness of Dr. Butler's medical judgment, we reach the same result and affirm the district court. Dr. Davis's affidavit states that the plastic bags posed an "obvious" risk to "potential suicide" patients. Normally, a jury may infer the subjective (awareness of a substantial risk) from the objective (obviousness of a risk). Cases of medical judgment are different. In Estelle, the Supreme Court recognized the distinction between a "medical judgment" and deliberate mistreatment.
 
 
 29
 [T]he question whether an X-ray--or additional diagnostic techniques or forms of treatment--is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice....
 
 
 30
 Estelle, 429 U.S. at 107, 97 S.Ct. at 292-93. Mere differences of opinion among medical personnel regarding a patient's appropriate treatment do not give rise to deliberate indifference. Id.; White v. Napoleon, 897 F.2d 103, 109-10 (3d Cir.1990). Dr. Davis simply disagrees with Dr. Butler regarding the likelihood that Cole would attempt to commit suicide.
 
 
 31
 The question then becomes how "obvious" a risk must be, or how "erroneous" a medical professional's treatment decision must be, such that a jury may infer subjective awareness of the risk in a medical treatment case. The answer is that deliberate indifference may be inferred based upon a medical professional's erroneous treatment decision only when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment.
 
 
 32
 The rule we recognize today is borrowed from the Supreme Court's decision in Youngberg v. Romeo, 457 U.S. 307, 322-23, 102 S.Ct. 2452, 2461-62, 73 L.Ed.2d 28 (1982). Youngberg has particular relevance to today's case. In Youngberg, the Court held that a mentally retarded individual, who was involuntarily committed to a state institution, had a substantive right to freedom from bodily restraint pursuant to the Fourteenth Amendment's Due Process Clause. Id. at 316, 102 S.Ct. at 2458. The Court noted that this right extends to convicted prisoners and to those patients who are involuntarily committed. Id. Cole, as a pretrial detainee, retained this right. Thus, Cole had a right to be free from bodily restraint.
 
 
 33
 This is one end of the spectrum of Cole's rights. At the other end of the spectrum is the right urged by plaintiffs today: Cole's right to safety--essentially a right to be restrained so that he would not injure himself. When faced with treatment of an individual in state custody, a medical professional must consider conflicting rights. Cole had a right to be free from restraint, but this right was not absolute; it ended at the point at which his freedom of restraint posed the substantial risk that he would seriously injure or kill himself. Cf. id. at 319-20, 102 S.Ct. at 2459-60 (noting that liberty interests in safety and freedom from bodily restraint "are not absolute; indeed to some extent they are in conflict"). At that point, Cole had a right to appropriate treatment, including bodily restraint. Where these conflicting rights intersect is a matter of medical judgment. In making this judgment, the medical professional must balance the need for treatment against competing concerns--i.e., preventing unnecessary treatment, the need for freedom from unnecessary restraint, etc. Surely, if defendants bound, gagged, and immobilized like Hannibal Lecter every patient for the sole purpose of preventing the patients from injuring themselves, then Cole would not have been able to access the plastic bags. At the same time, however, defendants would have violated Cole's right to be free from bodily restraint because the doctor would have failed to exercise medical judgment.
 
 
 34
 Youngberg and Farmer both require medical professionals to exercise medical judgment. The right to be free from bodily restraint is breached when an individual is restrained unless the decision was made "pursuant to an appropriate exercise of judgment by a health professional." Wells v. Franzen, 777 F.2d 1258, 1261 (7th Cir.1985) (citing Youngberg, 457 U.S. at 321-23, 102 S.Ct. at 2461-62). If the decision is made by a professional, it is presumptively valid. Youngberg, 457 U.S. at 323, 102 S.Ct. at 2462. We find that the same standard applies to allegations of improper medical treatment as evidence of "deliberate indifference." "[L]iability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." Id. (footnotes omitted).
 
 
 35
 In a recent opinion, this court addressed the interplay between the deliberate indifference inquiry and a defendant's provision of medical treatment. In Steele v. Choi, 82 F.3d 175, we affirmed the district court's grant of summary judgment in favor of a doctor that had allegedly provided incompetent medical treatment to a state prisoner.
 
 
 36
 Plaintiff Steele, an Indiana prisoner, ultimately was diagnosed as having a subarachnoid hemorrhage (internal bleeding of the brain). Unfortunately, Steele was not diagnosed until after he had suffered considerably. Steele claimed that the defendant, Dr. Choi, misdiagnosed his condition for a period of approximately five days. Steele framed the issue as whether "his admitted symptoms were so obviously indicative of the subarachnoid hemorrhage that Dr. Choi must have known this was the problem, and thus Dr. Choi's failure to take any steps to order a medical workup for Steele to confirm the diagnosis amounted to deliberate indifference to a serious medical need." Id. at 178. We noted that Steele's argument on appeal "boils down to the proposition that a minimally competent doctor, looking at the symptoms Dr. Choi saw, would have known that subarachnoid hemorrhage was possible and would therefore have ordered the necessary tests to confirm the diagnosis." Id. at 179.
 
 
 37
 We rejected Steele's arguments because Steele's symptoms were consistent with conditions other than subarachnoid hemorrhage and the evidence indicated that Dr. Choi did not know the actual cause of Steele's symptoms. Id. ("There is no evidence here tending to suggest that Steele's symptoms were consistent only with subarachnoid hemorrhage, and there is certainly no evidence that Dr. Choi was ignoring Steele's needs." (emphasis in original)). Steele's case might have been different if the symptoms clearly required a particular medical treatment but Dr. Choi had deliberately chosen not to provide it. Id. (citing as examples "the leg is broken, so it must be set; the person is not breathing, so CPR must be administered").
 
 
 38
 Steele's claim was remarkably similar to plaintiff's claim in the instant case: a minimally competent doctor in defendants' shoes would have been aware of a substantial risk. As in Steele, today we find that plaintiffs have not established a genuine issue whether defendants were deliberately indifferent. Plaintiffs do not argue that Dr. Butler's diagnosis of Cole as a "potential suicide" risk was such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that Dr. Butler did not base her diagnosis on such judgment. Thus, plaintiffs cannot establish that Dr. Butler was deliberately indifferent to Cole's serious medical needs.
 
 III.
 
 39
 Although the foregoing discussion addresses Dr. Butler, we find that the district court's entry of summary judgment in favor of the defendant nurses was also appropriate. There is no evidence that the nurses had any input into Cole's risk classification. The risk classification is most appropriately made by a licensed psychiatrist, and there is no evidence that the nurses observed any behavior that required them to ask one of the Hospital's doctors to reevaluate Cole or change Dr. Butler's "potential suicide precautions" classifications. In fact, it would have been inappropriate for any of the nurses to change Cole's classification for anything other than a temporary basis without consulting a physician.
 
 IV.
 
 40
 Although we are sympathetic to plaintiffs' grief, we agree with the district court that there is no evidence in the record that establishes that defendants were deliberately indifferent to Cole's serious medical needs. We therefore AFFIRM the district court's entry of summary judgment in favor of defendants.
 
 
 
 [1]
 The Eighth Amendment's prohibition on cruel and unusual punishment gives rise to the constitutional rights of a convicted state prisoner. Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). A pretrial detainee's constitutional rights are distinct from a prisoner's rights because the State cannot punish a pretrial detainee. Bell v. Wolfish, 441 U.S. 520, 535 & n. 16, 99 S.Ct. 1861, 1871-72 & n. 16, 60 L.Ed.2d 447 (1979). Thus, the source of the pretrial detainee's rights is the Fourteenth Amendment's Due Process Clause and the pretrial detainee's rights are "at least as great as the Eighth Amendment protections available to a convicted prisoner." City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983). Plaintiffs do not argue that Cole's Fourteenth Amendment Due Process rights are broader than a convicted felon's Eighth Amendment right to be free from cruel and unusual punishment. See Hare v. City of Corinth, 74 F.3d 633 (5th Cir.1996) (noting that the Supreme Court has not resolved the issue and holding that deliberate indifference standard applies to a pretrial detainee's 42 U.S.C. § 1983 claim). Plaintiffs have forfeited that argument by arguing that the deliberate indifference inquiry established in Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811, governs this case
 
 
 [2]
 We assume that Dr. Butler was aware of the existence of the bags and the danger that they posed to Cole. If she was not aware, then she could not be liable