**Patrick J. HIGGINS, Plaintiff–Appellant,**

**v.**

**CORRECTIONAL MEDICAL SERVICES OF ILLINOIS, INC.; Gerald H. Cerniak, Dr., individually and in his official capacity as staff physician at the Kane County Jail; Karen Botello, individually and in her official capacity as a staff nurse at the Kane**

County Jail; and Julia Brown, individually and in her official capacity as a staff nurse at the Kane County Jail, Defendants–Appellees.

No. 98–2856.

United States Court of Appeals, Seventh Circuit.

Argued March 29, 1999.

Decided May 24, 1999.

Rehearing and Rehearing En Banc Denied July 27, 1999.

Richard T. Ryan (argued), John Patrick Cleary, Flynn, Murphy & Ryan, Chicago, IL, for Plaintiff–Appellant.

Robert P. Vogt (argued), Weldon–Linne & Vogt, Chicago, IL, for Defendants–Appellees.

Before RIPPLE, ROVNER, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

In this suit, brought under 42 U.S.C. § 1983, Patrick Higgins accuses the Correctional Medical Services of Illinois (CMS) and three of its employees of deliberate indifference to his serious medical needs while he was being held in the Kane County (Illinois) Jail. Higgins claims he had a dislocated shoulder which defendants failed to treat, at least in part because of a policy designed to save money and their knowledge that he was on the cusp of being extradited to Mississippi and would soon be out of their hair. Summary judgment was granted to the defendants, a decision we review *de novo*. *Washington v. Summerville*, 127 F.3d 552 (7th Cir. 1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1515, 140 L.Ed.2d 668 (1998).

Higgins was arrested by Aurora, Illinois, police on a fugitive warrant stemming from a "bad check" charge in Mississippi. He was placed in the Kane County Jail on June 14, 1994, to await extradition. On June 16 he was handcuffed as he was transported to and from court. Higgins, who had previously dislocated his shoulder on two or three occasions, claims that his shoulder did not "feel right" after the handcuffing. In his original complaint he had said that he suffered a shoulder dislocation on the 16th, but now he says that it was on June 19 when he felt his shoulder had been dislocated in his sleep. It was for this injury that he sought medical treatment at the jail.

Defendant CMS, which runs the infirmary at the jail, is a private, for-profit company providing medical services under a contract with the county. Under the contract, CMS is paid $1,033,376 per year. Any emergency room or ambulance services, up to $7,500 per inmate, are paid by CMS.

In the infirmary, Higgins was offered Tylenol and ibuprofen by nurses, and an appointment was set up with a doctor, and later a psychologist. But there is a question whether he was willing to let anyone examine the shoulder. At any rate, no treatment was provided, no X rays were taken, and he was not transported to a hospital.

■ To state a claim for an Eighth Amendment violation, a plaintiff must show that the defendants were deliberately indifferent to his serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Higgins was a pretrial detainee and thus not protected by the Eighth Amendment; however, "the due process rights of a pre-trial detainee are at least as great as the Eighth Amendment protection available to a convicted prisoner." *Estate of Cole by Pardue v. Fromm,* 94 F.3d 254, 259 (7th Cir.1996), *cert. denied,* 519 U.S. 1109, 117 S.Ct. 945, 136 L.Ed.2d 834 (1997). Under the Fourteenth Amendment, a claim for denial of medical services is analyzed under the Eighth Amendment standards. *Cole.*

■ For purposes of this case, it is undisputed that a shoulder dislocation causes great pain and is a serious medical need. What we need to look at is whether the defendants were deliberately indifferent to Higgins' needs, which encompasses what they knew about his condition. To be deliberately indifferent a prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The official must know there is a risk and consciously disregard it. It is not enough that he "should have known" of the risk; the standard is not the same as it would be for a medical malpractice claim. In other words, it is a subjective standard. However, a plaintiff may establish subjective awareness of risk by proof of its obviousness. *Cole.* Also, an official cannot deliberately avoid knowledge of a risk that he strongly believes to be present. *Farmer.*

In more detail, the facts show that during the afternoon of June 19, Higgins convinced a guard to take him to the infirmary where he saw Julia Brown, a licensed practical nurse. According to Brown's notes on Higgins' chart, he "complained of left shoulder being popped out of joint. Stated had to be reset immediately." She looked at his shoulder but did not record her observations on his chart. She tried to palpate Higgins' shoulder but he refused to let her do so because of the pain. She explained to him that there were procedures she would have to follow in order to obtain treatment for him.

Brown testified that when she saw Higgins she did not consider his condition an emergency; in fact, she did not think he had a dislocated shoulder. Her understanding was that if a shoulder is dislocated, the "bone is going to be sticking up" and "the person is going to be in so much pain, it's going to show on their face. They're going to be sweating. You look at it, you're going to see discoloration or swelling." Later she said that persons with dislocations are "going to be trying to support their arm and not just, you know, dropping your shoulder like that." Her observation was that, unlike a person showing classic symptoms, Higgins walked in a normal manner; he did not appear to be in any pain; he was not sweating; he was talking normally; he refused the Tylenol she offered him; and he walked back to his cell.

The next person who saw Higgins was another nurse, Karen Botello, who actually saw him several times, the first being when he returned to the infirmary a little over an hour after Brown had seen him. She noted that his left shoulder was "forward and lower than right" but that he could walk and talk normally and exhibited no signs of extreme pain. He asked to be taken to a hospital. She offered him Tylenol, which he refused. Higgins left the

infirmary but returned again an hour later. At this time, Botello called the medical director, who agreed with her treatment plan—that is, that Higgins should see the doctor in the morning.

At about 9 p.m. the same night, Botello saw Higgins again. This time she attempted to place his arm in a sling, but he "bent forward and then began hopping around the room stating his arm was in spasm." She doubted that this was true because his arm was not moving spasmodically. When asked whether it appeared that he was reacting to pain, she said that it "appeared like he was just playing around."

Botello did check his arm at this time. Her notes say it was warm and pink but that his pulse was strong and his circulation, motion, and sensation were good. At her deposition Botello explained that what she was doing was checking to be sure that his nervous or circulatory systems were not affected by any possible injury. She noted on the chart that he was "sitting in a chair no distress noted." He refused to leave the unit until the medical director was called, but when security arrived he voluntarily went to the infirmary, where he was housed overnight. At this time he refused the Tylenol Botello offered him. Botello saw him again at 10:45 p.m., and this time he asked for Tylenol.

In her deposition Botello said that her understanding was that a dislocated shoulder involves intense pain, swelling, and obvious deformity. The dislocation could involve nerve or blood vessel damage. She had, however, never treated a patient for a dislocation, prior to its being reduced.

Botello's overall impression was that Higgins was favoring his shoulder, but that he was able to walk normally, was not sweating, had normal color, and did not show signs of extreme pain. In fact, had he been in extreme pain, she did not think that he could jump around the way he did.

Based on her observations she saw no reason to transfer him to a hospital or to call a doctor.

The next morning Dr. Gerald Cerniak (who, along with Nurses Brown and Botello became the individual defendants in this suit) arrived and saw Higgins, although his notes indicate that Higgins would not let him examine the shoulder. Higgins claims to the contrary; Higgins says he was so happy to see a doctor that he would have allowed him to do anything. Dr. Cerniak testified that, based on his experience, he did not think Higgins had a dislocated shoulder when he saw him. After seeing Dr. Cerniak, Higgins underwent a psychological evaluation from a psychologist, Kris Metcalf, who testified that he saw nothing wrong with Higgins' shoulder. That night Higgins fell asleep and awoke without any more shoulder pain—in other words, with a normal shoulder. He left the jail that morning on his ticket to Mississippi.

In support of his claim, Higgins presents the deposition of another jail inmate, Vincent Taylor, who said Higgins was moaning in pain and his shoulder was "hanging down at little bit on his—you know, and kind of sticking out."

Also, Higgins presents expert testimony from Dr. Audley Loughran, who concluded that a dislocation probably did occur between the time two particular X rays were taken—the first at the time of Higgins' last previous dislocation and the second when his injury was treated on July 8, 18 days after he left the Kane County Jail. Loughran cannot say when the dislocation occurred, but in his affidavit he states that, based on the records, he thinks Higgins had a dislocated shoulder in the jail and that the X ray shows a compression fracture of the left humeral head, a Hill Sachs Lesion, but he does not say the fracture was present in the jail.[1]

---

1. In fact, Dr. Loughran acknowledged at his deposition that another radiologist who viewed the same X ray was not able so say one way or another whether the Hill Sachs deformity existed.

It is Botello's notes, rather than those made by other medical personnel, on which Dr. Loughran bases his conclusion that Higgins may actually have had a dislocated shoulder while he was in the Kane County Jail. He relied solely on her notes and had not read her deposition, in which she explains what her notes mean to her. In other words, it is Botello's notation on the chart that the shoulder was "forward and lower than right" that caused Dr. Loughran to think the shoulder was dislocated. He acknowledges, however, that ordinarily immense pain would be present with a dislocation. In fact, he said that in his 30 years of practice he had never had a patient with a dislocated shoulder who could walk into his office exhibiting no distress and who refused to allow an examination. He also acknowledged that nothing in Dr. Cerniak's notes indicated that Higgins seemed to be in extreme pain. He does not dispute Dr. Cerniak's assessment that at the time he saw him, Higgins did not seem to have a dislocation.

Nevertheless, Dr. Loughran's conclusion is that the defendants did not act properly; they did not provide any medical treatment; they did not order X rays, administer proper pain medication; reduce the dislocated shoulder, or perform surgery. Specifically, he says that Dr. Cerniak and Nurse Brown should have ordered an X ray. In fact, he says that if he were Dr. Cerniak he "would get an x-ray, save my butt." He acknowledged that ordering an X ray would be practicing "defensive medicine," a concern, it would seem, more for himself than the patient. Of Nurse Botello, he says that he does not say that she was attempting to cause Higgins any harm, but that she may have missed or improperly assessed his condition. Dr. Loughran specifically says her actions were not premeditated. When asked if she committed malpractice, he says only that she committed an "error in judgment."

■ We doubt that a claim for medical malpractice could be made out on these facts. Certainly, we cannot conclude that any one of the individual defendants was deliberately indifferent to Mr. Higgins. An error in judgment does not imply a deliberate act. We cannot conclude that the defendants knew Higgins had a serious medical need. He was not exhibiting the level of pain ordinarily associated with a dislocated shoulder. He refused to let Nurse Brown examine the shoulder. Taking his word for the fact that he would have let Dr. Cerniak palpate the shoulder, no such examination occurred. Higgins does not claim that Dr. Cerniak was deliberately indifferent for not doing the examination. The claim is that he was deliberately indifferent for not doing exactly what Higgins wanted—that is, to send him to a hospital to be x-rayed. That claim is, at least in part, disposed of by *Estelle v. Gamble* itself. Gamble claimed that his lower back pain was not properly treated and that he should have been x-rayed. The court said:

> A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice, and as such the proper forum is the state court. . . .

At 107, 97 S.Ct. 285.

Except for Nurse Botello's comment that he had an "alteration in comfort," there is no indication of severe pain. In fact, Nurse Botello's notes also indicate that at 10:45 p.m. there was "no distress noted."

Looking at the totality of the circumstances, we have little trouble concluding that summary judgment was properly granted to the individual defendants.

■ As to the claim against CMS, Higgins alleges that to save money it instituted a policy of denying medical treatment to those who were soon to be transferred elsewhere and that its policy of having nurses seek approval before sending inmates to the hospital was designed to keep costs down. If there was no constitutional

violation on the part of the individual defendants, however, CMS's policies could not have caused one, even if they were trying to keep costs down—a common goal in this age of health maintenance organizations. Summary judgment was properly granted to CMS.

■ Higgins also appeals the denial of his Rule 37 motion for sanctions. We review a ruling on a motion for sanctions for an abuse of discretion. Higgins alleges that defendants engaged in a number of discovery abuses, refused to accept service on Dr. Cerniak, disclosed Vincent Taylor's medical records, and appended to their motion for summary judgment affidavits of four "new" witnesses, witnesses he could have also sued if he had known of them before the statute of limitations ran out. On the latter point, defendants say the names were in the medical records—which consisted of only 8 pages. We have examined the record and find no abuse of discretion in the denial of the motion for sanctions.

The judgment of the district court is AFFIRMED.

ILANA DIAMOND ROVNER, Circuit Judge, dissenting.

I find myself of a different view than the majority which states that it cannot conclude that the defendants knew Higgins had a serious medical need. On summary judgment, Higgins need only show that there is a genuine issue as to whether the defendants knew of his serious medical need, and he accomplishes that with Nurse Botello's notes. Three times those notes indicate that Higgins' left shoulder is "forward and lower than right." Higgins' expert states that a dislocated shoulder can be diagnosed visually, and that Botello's notes describe the classic visual appearance of a dislocated shoulder. Indeed, two of the defendants testified at their depositions that a dislocated shoulder can be visually observed, and described the condition in terms similar to those noted by Nurse Botello. *See* Deposition of Julia A. Brown, Supplemental Record, Volume 3, Exhibit L, p. 35–36 ("You can look at a shoulder and tell if it's dislocated.... This bone is going to be sticking up, and this is going to be kind of sagging."); Deposition of Dr. Gerald H. Cerniak, Supplemental Record, Volume 3, Exhibit N, p. 26 ("If you had a mass protruding out visibly, ostensively—now, this is a gross dislocation—you could say that appears to be compatible with the likelihood of a dislocated shoulder.").

Higgins' theory of the case is analogous to that of the plaintiffs in two of our recent cases. *See Steele v. Choi*, 82 F.3d 175 (7th Cir.1996); *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254 (7th Cir.1996). There the plaintiffs posited that a minimally competent doctor, observing the symptoms the plaintiffs displayed, would have known that the plaintiffs were possibly suffering from serious medical conditions and would have ordered tests to confirm the diagnosis. We held in both of those cases that the plaintiffs failed on summary judgment when all they could show was that some experts were of the view that certain tests should have been ordered or that the symptoms presented were strong and obvious indicators of serious medical risk. *Steele*, 82 F.3d at 179; *Cole*, 94 F.3d at 263. What was needed, we held, was a showing that the medical professional objectively *knew* about the serious medical condition, and deliberately decided not to furnish the necessary treatment.

We commented in both of those cases that the result may have been different if the symptoms clearly or plainly required a particular medical treatment. For example, "the leg is broken, so it must be set; the person is not breathing, so CPR must be administered." *Steele*, 82 F.3d at 179. In these cases, the risk is so obvious, that the plaintiff may establish the defendant's knowledge of the risk through the obviousness alone. Higgins presents us with that case. The defendants admit that a dislocated shoulder is a visually obvious condition, and one of them noted at the time

that Higgins displayed the classic visual symptoms. I fail to see how this differs from the broken leg or the patient who is not breathing. Higgins has certainly presented enough to overcome summary judgment on the issue of whether the defendants knew he was suffering from a serious medical risk when he has the defendant's own admission that he presented a classic visual symptom of a dislocated shoulder. This must be so unless we are willing to grant summary judgment when the nurse notes "patient was blue and nonresponsive" and later explains she did not understand that this meant the patient was not breathing. Or we must be willing to grant summary judgment when the nurse notes "leg was crooked and bone protruding" and then later explains that she did not understand this to mean the leg was broken. The defendants, of course, would be free to testify at trial that they thought Higgins was a malingerer because, although he presented classical visual symptoms, he was walking and talking normally and did not appear to be in excessive pain as one might expect under the circumstances. The finder of fact would certainly be free to believe the doctor and nurses if they testified that they did not objectively know the shoulder was dislocated, despite its appearance. My point is that this is a question for the factfinder, and not for the court on summary judgment.

Everyone seems to agree that the appropriate treatment for a dislocated shoulder is to "reduce the shoulder," that is, to place the bone back into the socket, using appropriate anesthesia, of course. And everyone also seems to agree that was not done here. Instead, Higgins was offered Tylenol and a visit to a psychologist. Contrary to the majority's portrayal of the case, Higgins did not simply request an x-ray, but also asked to have his shoulder reset. Because everyone agrees that would have been the appropriate treatment, and because he presents a genuine issue of material fact as to whether the defendants knew about his medical condi-

tion, I would reverse the grant of summary judgment and remand for trial. I respectfully dissent.