KANNE, Circuit Judge,
dissenting.
I agree with the majority’s opinion insofar as it forecloses Ortiz’s claim that there was a policy which forbade medical trips for all death-row inmates. There is no evidence of such a policy, and the majority rightly rejects this argument. I also agree that Ortiz has demonstrated that the pterygia in one of his eyes qualified as a serious medical condition. I part company with the majority, however, as to its conclusions regarding Dr. Webster’s state of mind. I do not believe that the facts of this case give rise to any possibility of deliberate indifference on the part of Dr. Webster during the time period of the complaint, and would therefore affirm the grant of summary judgment in Dr. Webster’s favor.
As the majority recognizes, the Eighth Amendment of the United States Constitution proscribes cruel and unusual punishment, a proscription that is violated when prison officials display “deliberate indifference to [the] serious medical needs of prisoners.” Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). “Deliberate indifference” is a robust state-of-mind requirement, ensuring that “the mere failure of the prison official to choose the best course of action does not amount to a constitutional violation.” Peate v. McCann, 294 F.3d 879, 882 (7th Cir.2002). Although a prisoner need not show that the official intended the harm that occurred to surmount this requirement, circumstances that suggest negligence — or even gross negligence — by the official are insufficient to establish a constitutional violation. Estelle, 429 U.S. at 106, 97 S.Ct. 285; McGowan v. Hulick, 612 F.3d 636, 640 (7th Cir.2010). Rather, deliberate indifference exists only if the official was aware of the condition and actually drew an inference that substantial harm would result if the condition was ignored or improperly addressed. Farmer v. Brennan, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); Gayton v. McCoy, 593 F.3d 610, 620 (7th Cir.2010).
Proving deliberate indifference in the medical context is especially difficult, as *737 the boundaries of reasonable treatment are broad. Doctors, like jurists, often disagree about what constitutes the “correct” result. Some doctors prefer more conservative treatment, engaging in surgical intervention only as a last resort, while other doctors utilize a more aggressive approach, deploying surgery before trying less invasive methods that they believe will be ineffectual. In many situations, both approaches to treatment would be “reasonable,” and a reasonable response to a medical risk — even if the harm was ultimately not averted — can never constitute deliberate indifference. Peate, 294 F.3d at 882. Even in those situations where one approach is reasonable and the other is not, a “difference of opinion among physicians on how an inmate should be treated” generally suggests — at worst — a negligent state of mind, as the doctor’s mistaken belief that his treatment will succeed vitiates any possibility of deliberate indifference. See Norfleet v. Webster, 439 F.3d 392, 396 (7th Cir.2006).
Keeping these principles in mind, I turn to Ortiz’s claim. The majority points to two instances of possible deliberate indifference: Dr. Webster’s decision in 2003 not to approve surgery, and Dr. Webster’s follow-up care between 2003 and late 2005. The majority discerns enough evidence of deliberate indifference at both points, but I remain convinced that Dr. Webster’s conduct evinces no more — and perhaps less— than a negligent state of mind.
The majority focuses first on Dr. Webster’s initial decision to ignore some of the recommendations for surgical excision. The eye experts consulting at the prison came to dueling conclusions regarding Ortiz’s care: a number thought that surgery was necessary, but one, Dr. Radaneata, concluded that Ortiz did not yet need an excision because his condition could be managed with eyedrops. When Dr. Webster started at the prison in 2003, he reviewed Ortiz’s file and sided with the expert who preferred less invasive treatment, concluding that surgery might be necessary in the future but was not yet needed. Despite Dr. Webster’s reliance on a specialist’s opinion, the majority suggests that a jury could reasonably conclude that Dr. Webster knew or recklessly failed to know that Ortiz’s symptoms warranted surgery during his initial review. Ante at 734-35. On the contrary, I see nothing that would permit a jury to discern recklessness on the part of Dr. Webster at that point. Perhaps if the treatment for Ortiz’s diagnosis was clear and there was no way any physician would view the dissenting specialist as providing a reasonable recommendation, there would be enough for a jury to find recklessness. See, e.g., Steele v. Choi, 82 F.3d 175, 179 (7th Cir.1996) (“If the symptoms plainly called for a particular medical treatment — the leg is broken, so it must be set; the person is not breathing, so CPR must be administered — a doctor’s deliberate decision not to furnish the treatment might be actionable____”). But treatment for pterygia is not clear-cut — especially to a non-specialist like Dr. Webster^ — -and I cannot fathom why Dr. Webster’s decision to credit one eye expert over another at the time of his review points to anything more than negligence. See Norfleet, 439 F.3d at 396; Estate of Cole by Pardue v. Fromm, 94 F.3d 254, 262 (7th Cir.1996).
Nor do I believe that Dr. Webster’s follow-up care was constitutionally deficient. The majority concludes that Dr. Webster was possibly deliberately indifferent because he “ignored his own conclusions in 2003” regarding the need for and scope of follow-up care. Ante at 735. But Dr. Webster did not ignore his own followup orders. Those orders, contrary to the majority’s assertions, ante at 735, recom *738 mended only that Ortiz see a specialist for follow-up; they said nothing about the types of tests that should be ordered. And that recommendation was followed. In 2004, after Dr. Webster’s initial review, Ortiz was evaluated by an optometrist, who concluded that excision was still unnecessary despite tissue encroachment into the eye. Ortiz was also issued a prescription for eyeglasses around that time, meaning that his visual acuity must' have been evaluated. Finally, Ortiz was seen by a number of physician assistants throughout 2004. One saw Ortiz prior to his appointment with the optometrist and noted the stage of his corneal encroachment for the optometrist’s review. The other assistants saw Ortiz after his visit with the optometrist; they noted no major change in Ortiz’s status since that visit and recommended Ortiz continue with noninvasive treatment. All of this shows that Ortiz was seen for follow-up in the manner originally recommended by Dr. Webster.
In light of the pre-review opinions favoring surgery, the majority also accuses Dr. Webster of “refusing to verify underlying facts” during the follow-up period. Ante at 735. True enough, Dr. Webster could not stick his head in the sand after his 2003 review and ignore facts that “he strongly suspected to be true.” Farmer, 511 U.S. at 843 n. 8, 114 S.Ct. 1970. But even read in the light most favorable to Ortiz, the record does not suggest such intentional ignorance. Rather, the sequence of events — along with Dr. Webster’s declaration — reflects that Dr. Webster relied on the 2004 follow-up by the optometrist (and Ortiz’s subsequent silence) to conclude that surgery remained unnecessary. Now, perhaps Dr. Webster’s decision to rely on that optometrist’s recommendation was a misjudgment — parts of the non-treating expert’s opinion suggested as much, and doctors who evaluated Ortiz in 2006 noted that he needed surgery on at least one of his eyes. But a clinical misjudgment is generally insufficient to establish a deliberately indifferent state of mind. See Duckworth v. Ahmad, 532 F.3d 675, 680 (7th Cir.2008); see also Foelker v. Outagamie County, 394 F.3d 510, 515 (7th Cir.2005) (Manion, J., dissenting). In the end, Dr. Webster’s follow-up decisions reflect an honest belief that noninvasive care was adequate, leaving little opening for a jury to conclude that his conduct was deliberately indifferent.
The majority concludes by stating that “[t]he addition of a non-treating doctor claiming surgery was unnecessary does not eliminate the dispute.” Ante at 736. But I believe that the non-treating expert’s opinion closes the one tiny window left open in Ortiz’s claim. We have consistently held that a difference Of opinion between physicians is insufficient to create an issue of fact as to deliberate indifference, as such a disagreement would rarely be enough to establish malpractice, much less the standard imposed on Eighth Amendment claims. See, e.g., Norfleet, 439 F.3d at 396; Pardue, 94 F.3d at 261. The exception to this rule is those cases where the physician’s viewpoint is so unreasonable and so ridiculous as to leave open an inference that the physician acted recklessly in choosing the course of treatment he did. Duckworth, 532 F.3d at 680; Steele, 82 F.3d at 178. The non-treating expert here opined that pterygia treatment is not straightforward, and that many doctors reasonably believe that noninvasive medical treatment is appropriate for a significant period before surgical treatment should be initiated. The expert’s uncontested opinion went on to state that Dr. Webster’s decisions were not reckless, meaning that they were not “so far afield as to allow a jury to infer deliberate indifference.” See Duckworth, 532 F.3d at 680. That sounds the death knell for Ortiz’s claim.
*739 It is unfortunate that Ortiz has the condition he does, and I sympathize with his plight. But there is a significant gap between negligent care and deliberate indifference, and the Supreme Court has made clear that mere negligence does not an Eighth Amendment violation make. Taking the facts in the light most favorable to Ortiz, I believe a reasonable jury could infer only negligence on the part of Dr. Webster — if even that. For that reason, I respectfully dissent.