NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted August 19, 2019[*]
Decided August 20, 2019

**Before**

FRANK H. EASTERBROOK, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

No. 19-1230

| | |
|---|---|
| JURIJUS KADAMOVAS,<br>    *Plaintiff-Appellant,*<br><br>*v.*<br><br>JOHN CARAWAY, *et al.,*<br>    *Defendants-Appellees.* | Appeal from the United States District<br>Court for the Southern District<br>of Indiana, Terre Haute Division.<br><br>No. 2:17-cv-00050-WTL-MJD<br><br>William T. Lawrence,<br>*District Judge.* |

**O R D E R**

Jurijus Kadamovas, an inmate at the Federal Correctional Complex who suffers from mild persistent asthma, says that his condition is exacerbated by exposure to secondhand smoke and chemical gas in his cell. He sued the prison's clinical director, Special Confinement Unit supervisors, and former and current wardens for being deliberately indifferent to his serious medical needs. The district judge granted the defendants' motion for summary judgment, concluding that Kadamovas did not have a

---

[*] We have agreed to decide the case without oral argument because the briefs and record adequately present the facts and legal arguments, and oral argument would not significantly aid the court. FED. R. APP. P. 34(a)(2)(C).

serious medical condition and, even if he did, officials did not willfully disregard it. Kadamovas filed a motion for reconsideration, to no avail. We affirm.

Kadamovas has trouble breathing whenever chemical gas wafts into his housing unit—the Special Confinement Unit—through heating and cooling vents from the Special Housing Unit downstairs. Based on his own calendar entries, Kadamovas believes that tear gas was used in the Special Housing Unit 30 times between 2013 and 2018. He believes that the gas is being used because during these episodes he cannot breathe and experiences symptoms that include crying, diarrhea, and vomiting. When this occurs, he bangs on the door of his cell or presses an emergency button, and staff takes him to an outdoor recreation area for about an hour to an hour and a half.

Smoke causes Kadamovas similar problems. Whenever inmates smoke or set fires in the Special Housing Unit (an occurrence that he estimates at 15-20 days each month), he wakes up unable to breathe. Because he cannot open the window in his cell, any smoke that enters cannot escape.

Kadamovas wrote multiple grievances and emails, asking for a "permanent solution" to the smoke and gas issues. Each time, he received a response from the current warden. One warden wrote to Kadamovas, explaining that any inmate who started a fire would receive an incident report, and that prison staff—despite taking precautions to prevent fires—had limited ability to stop them entirely. Another warden informed Kadamovas that staff was undertaking other efforts to mitigate the effects of gas and smoke, including shutting off the vents between the units and changing air filters more frequently than required to avoid residual contamination. And to reduce further potential exposure, staff in 2015 moved him to a cell in the upper tier of the Special Confinement Unit.

Medical staff also took steps to respond to Kadamovas's problems. In response to his breathing issues, they treated him 17 times between 2014 and 2016. At each evaluation, his lungs were found to be clear and his respiration normal. He asked in 2014 to see an outside pulmonologist, but his request was denied by the utilization review committee. In early 2016, the clinical director examined Kadamovas and determined that, given the subjective nature of his complaints, he should see a pulmonary specialist.

Kadamovas was seen by a pulmonologist in May 2016. The pulmonologist performed a pulmonary function test—which showed no obstruction, restriction, or air

trapping—and prescribed Kadamovas a daily inhaler and medications for wheezing and shortness of breath.

Kadamovas's problems persisted. More than half a year later, he complained that smoke made him short of breath, but the responding nurse found him at his cell breathing easily, without any cough. Four months later, he complained to a nurse that smoke was raising his blood pressure. The nurse found that he had no breathing problems, but his blood pressure was elevated. After he received a nebulizer, his blood pressure dropped, and he reported feeling better.

The district judge granted the defendants' motion for summary judgment. The judge first concluded that Kadamovas's asthma and breathing problems were not an objectively serious medical need. Alternatively, the judge explained, no defendant acted with deliberate indifference. The former and current wardens each took steps to ensure that Kadamovas received appropriate medical care and attempted to reduce his exposure to smoke and gas. The Special Confinement Unit supervisors were not personally involved in any potential constitutional deprivation, as neither had decision-making authority over the Special Housing Unit and thus lacked the ability to restrict contraband there or control the frequency with which chemical gas was used. And the clinical director and his staff proffered extensive medical care. The judge also noted that, although Kadamovas criticized the clinical director for delaying his visit to a pulmonologist, it was actually the utilization review committee who denied this request. The judge then denied Kadamovas's ensuing motion for reconsideration, concluding that he failed to point to any misapplication of precedent in the court's order or to present any new evidence.

On appeal, Kadamovas argues that the district court improperly entered summary judgment for the non-medical defendants because they failed to adequately protect him from the harmful effects of smoke and chemical gas. Even though staff removed him from his cell when chemical gas was used, he says, his removal took place only *after* he had already begun to suffer the medical consequences. He asserts that staff's precautions to shut off the air ventilation and change the air filters make "very little differen[ce]." And his relocation to a unit further from the Special Housing Unit did not help, as smoke and gas still reached him.

Even if we accept Kadamovas's contention that his medical condition is serious, he has not raised a fact question over the subjective component of deliberate indifference. *See Farmer v. Brennan*, 511 U.S. 825, 839–40 (1994); *Huber v. Anderson*, 909

F.3d 201, 208 (7th Cir. 2018). Kadamovas believes that the defendants could have been more vigilant in minimizing the effects of gas and smoke, but presents no evidence that their efforts approached criminal recklessness. *See Lee v. Young*, 533 F.3d 505, 511 (7th Cir. 2008). Rather, the record indicates that defendants responded to Kadamovas's complaints: they provided him regular access to medical care, allowed him to go to an outside recreation area to avoid the harmful effects of gas, and relocated him to an upper-tier cell. His unsupported contention that the defendants could have done more cannot stave off summary judgment.

Kadamovas also asserts that the district judge erred in concluding that the clinical director could not be responsible for delaying his appointment with a pulmonologist, purportedly because the utilization review committee had denied the request. But the judge did not consider, he says, whether the clinical director could have granted his request *before* the utilization review committee's denial in 2014.

Even if we assumed that the clinical director had this authority, there is no indication that his failure to schedule outside appointments amounts to deliberate indifference. True, deliberate indifference can be inferred when a prison physician recklessly delays referring a patient to an outside specialist for non-medically justified reasons. *See Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011). But here, all evidence points to the clinical director exercising his medical judgment to diagnose Kadamovas's condition, both reviewing his medical records and personally examining him at chronic care visits. Nothing in the record suggests that concluding a pulmonologist visit was unnecessary before 2014 would have constituted a "substantial departure from accepted professional judgment, practice, or standards." *Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016) (en banc) (quoting *Cole v. Fromm*, 94 F.3d 254, 261–62 (7th Cir. 1996)).

Kadamovas also contends that the district court should have granted his motion for reconsideration because his attorneys' conduct "deviate[d] from professional standards of conduct." In order to prevail on his motion for reconsideration, however, Kadamovas needed to point to newly discovered evidence or establish "a manifest error of law or fact." *Burritt v. Ditlefsen*, 807 F.3d 239, 253 (7th Cir. 2015); FED. R. CIV. P. 59(e). His discontent with his attorneys' representation is neither.

AFFIRMED